(Slip Opinion)

# Paying for Removing Structures at the Treasure Lake Civilian Conservation Center

The interdepartmental-waiver doctrine, under which one agency generally may not pay to restore or repair property in the custody of another agency, prevents the Department of Labor from paying to remove structures at a defunct Job Corps site that is located within a wildlife refuge in the custody of the Department of Interior. No statutory authority has displaced that doctrine's applicability by authorizing the Department of Labor to pay for removing the structures.

February 22, 2019

MEMORANDUM OPINION FOR THE SOLICITOR OF LABOR

Your office has asked us to resolve a dispute between the Department of Labor ("Labor") and the Department of the Interior ("Interior") about whether Labor may use its Job Corps appropriation to pay for removing several structures at the defunct Treasure Lake Civilian Conservation Center ("Treasure Lake") in the Wichita Mountains Wildlife Refuge in Indiahoma, Oklahoma.[1] Under the interdepartmental-waiver doctrine, one agency generally may not pay to restore or repair property in the custody of another agency. As different arms of a single government, federal agencies typically cannot bring claims for repairs or restorations against one another; instead, the interdepartmental-waiver doctrine provides the long-standing default rule for allocating such costs. Because Interior has custody of the land at Treasure Lake, Labor contends that the interde-

---

[1] In considering this question, we requested and received the views of the Department of Labor, the Department of Interior, and the Office of Management and Budget. *See* Letter for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from M. Patricia Smith, Solicitor of Labor (Dec. 21, 2016) ("Labor Letter"); Letter for Curtis E. Gannon, Acting Assistant Attorney General, Office of Legal Counsel, from Daniel H. Jorjani, Principal Deputy Solicitor, Department of Interior, *Re: Removal of Treasure Lake Job Corps Facility Structures* (June 30, 2017) ("Interior Letter"); Letter for Curtis E. Gannon, Acting Assistant Attorney General, Office of Legal Counsel, from Heather V. Walsh, Acting General Counsel, Office of Management and Budget (July 7, 2017); Letter for Curtis E. Gannon, Acting Assistant Attorney General, Office of Legal Counsel, from Nicholas C. Geale, Acting Solicitor of Labor (Aug. 1, 2017) ("Labor Reply Letter"); E-mail for Daniel L. Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Heather V. Walsh, Acting General Counsel, Office of Management and Budget (Aug. 30, 2017, 4:54 PM).

partmental-waiver doctrine requires Interior to restore the property. Interior argues that the doctrine should not apply to intentional alterations of property and that Labor should rely upon its own appropriations to perform the restoration. We conclude that the interdepartmental-waiver doctrine does apply here, and that Congress has not otherwise authorized Labor to pay for removing the structures on land in Interior's custody.

## I.

The Wichita Mountains Wildlife Refuge is one of the Nation's oldest conservation areas, first established in 1905 by President Theodore Roosevelt as a reserve for game animals and birds. *See* Interior Letter at 2; Pub. L. No. 58-24, 33 Stat. 614 (1905) (*codified as amended at* 16 U.S.C. § 684); Proclamation of June 2, 1905, 34 Stat. 3062; Pub. L. No. 74-637, tit. I, 49 Stat. 1421, 1446 (1936). Interior administers the wildlife refuge with the aim of long-term conservation. *See* Interior Letter at 2; *see generally* 16 U.S.C. § 668dd.

In 1965, the Wichita Mountains Wildlife Refuge also became home to Treasure Lake, a center run under the auspices of the Job Corps program. *See* Labor Letter at 1; Economic Opportunity Act of 1964, Pub. L. No. 88-452, § 102, 78 Stat. 508, 508 (establishing Job Corps). Since 1998, Labor has overseen the Job Corps program, which is a primarily residential program that offers education and vocational training to young men and women. *See* 29 U.S.C. §§ 3191, 3194(a), 3197(c); Workforce Investment Act of 1998, Pub. L. No. 105-220, § 143, 112 Stat. 936, 1007. The program has more than 100 centers throughout the country. *See* Updated Methodology for Selecting a Job Corps Center for Closure and Center Proposed for Closure, 82 Fed. Reg. 44,842, 44,843 (Sept. 26, 2017). Most Job Corps centers are operated by businesses, nonprofit organizations, or tribes that have procurement contracts with Labor. *Id*. But those, like Treasure Lake, that are denominated "Civilian Conservation Centers" are operated under interagency agreements between Labor and other federal agencies. *See* 29 U.S.C. § 3197(d)(1); 20 C.F.R. § 670.310(e).

Under a series of such agreements, Labor paid for the buildings, structures, and operations at the Treasure Lake Job Corps site. *See* Labor Letter at 2; Interagency Agreement Between the United States Department

of Labor and the United States Department of Agriculture Governing the Funding, Establishment, and Operation of Job Corps Civilian Conservation Centers at 2–3 (March 10, 2008) ("Labor-Agriculture Agreement"). Appropriations for the Job Corps provide Labor with funds for, among other things, the "construction, alteration, and repairs of buildings and other facilities" used in the Job Corps program. Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, div. B, tit. I, 2018 U.S.C.C.A.N. (132 Stat.) 2981, 3050 ("Labor FY 2019 Appropriations"); *see also* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. H, tit. I, 131 Stat. 135, 504 (similar provision for prior year). Meanwhile, the Fish and Wildlife Service (part of Interior) and the Forest Service (part of the Department of Agriculture) at various points conducted the day-to-day operations at Treasure Lake. *See* Labor Letter at 2; Labor-Agriculture Agreement at 1–4.

During its time as a Civilian Conservation Center, Treasure Lake evolved into a "26-building facility," with "a heliport, fuel station, motor pool, carpentry shop, brick masonry shop, library, cafeteria, gymnasium, dormitories and numerous other features." Interior Letter at 6. In 2014, however, Labor selected Treasure Lake for closure based on performance-related statutory criteria. *See* Final Methodology for Selecting a Job Corps Center for Closure and Center Selected for Closure: Comments Request, 79 Fed. Reg. 51,198 (Aug. 27, 2014) (announcing initial closure decision); Final Notice of Job Corps Center for Closure, 79 Fed. Reg. 61,099 (Oct. 9, 2014) (announcing final decision). Treasure Lake closed in June 2015, and Interior regained complete custody of the land in December 2015. *See* Labor Letter at 3.

Interior now wants Labor to pay for the removal of the Treasure Lake structures because Interior views them as "inconsisten[t] with the [Fish and Wildlife Service's] statutory mandate" to manage the Wichita Mountains Wildlife Refuge. Interior Letter at 6. Specifically, Interior suggests that the structures may have lead-based paint and asbestos that could contaminate the refuge and that the structures "create a negative visual impact to visitors at nearby scenic areas." *Id*. at 7. The costs of removal may run between $7 million and $9.5 million. *See id*. at 2.

## II.

Labor identifies two primary reasons why it cannot pay to remove the structures at Treasure Lake: (1) it contends that the interdepartmental-waiver doctrine requires Interior, as the agency with custody of the land, to bear the costs of restoring land that was temporarily used by another agency; and (2) alternatively, it contends that specific appropriations authorize Interior to pay to remove buildings on lands within national wildlife refuges, implicitly preventing Labor from using a more-general appropriation to do the same thing. *See* Labor Letter at 1–2.

Interior disagrees that the interdepartmental-waiver doctrine would bar Labor from paying for remediation at Treasure Lake because, in its view, that doctrine should be limited to circumstances where one agency unintentionally damages another agency's property—excluding those where, as here, one agency intentionally alters real property. Interior invokes another appropriations principle, the necessary-expense doctrine—which permits an agency to make those expenditures reasonably necessary to carry out the objects of an appropriation—and contends that Labor may use its Job Corps appropriation to pay for removing the structures. *See* Interior Letter at 5–11; *see also* 1 General Accounting Office, *Principles of Federal Appropriations Law* 4-20 (3d ed. 2004) ("*Federal Appropriations Law*"). Interior concludes that the structures' removal "is more central to" Labor's Job Corps appropriation than it is to Interior's construction appropriation. Interior Letter at 9.

We conclude that the interdepartmental-waiver doctrine prevents Labor from paying to remove the structures at Treasure Lake. The doctrine embodies a long-standing principle of appropriations law: The agency with custody of property bears the costs of any repairs arising from another agency's temporary use of that property. While that default rule may be overcome by a statute—or by an interagency agreement authorized by statute—no statute or agreement applies to overcome the doctrine here. Nor does the necessary-expense doctrine suggest a different result. Although the necessary-expense doctrine may expand the availability of agency appropriations beyond what Congress has expressly specified, it does not implicitly authorize interdepartmental reimbursements.

## A.

The interdepartmental-waiver doctrine is a long-established piece of federal appropriations law. The doctrine prescribes that, absent legislation providing otherwise, one agency may not expend federal funds to restore another agency's property. *See, e.g.*, 2 *Federal Appropriations Law* at 6-197 (3d ed. 2006) ("What happens when one federal agency damages the property of another agency? Under the so-called 'interdepartmental waiver doctrine,' the general rule is that funds available to the agency causing the damage may not be used to pay claims for damages by the agency whose property suffered the damage."); *Payment by National Weather Service to Bonneville Power Administration for Use of Microwave Radio Station Site*, 71 Comp. Gen. 1, 2–3 (1991) ("*National Weather Service*") (explaining that the doctrine ordinarily "prohibits a federal agency from paying for the use or repair of real property controlled by another federal agency").

The interdepartmental-waiver doctrine derives in significant part from the idea that government property does not belong to any single agency, but to the federal government as a whole. *See* 2 *Federal Appropriations Law* at 6-197. Because the government cannot bring a damages claim against itself, and because agencies are not free to redistribute the funds that Congress has appropriated, default rules are needed for allocating certain costs between agencies. The interdepartmental-waiver doctrine is the rule that generally governs the repair and restoration of loaned property. It provides that the agency with custody over the property should bear the costs of any losses arising from its use by other agencies. *See National Weather Service*, 71 Comp. Gen. at 2; *Reimbursement by Navy to Federal Aviation Administration for Damage to Instrument Landing System*, 65 Comp. Gen. 464, 466, 468 (1986); *Departments and Establishments—Damage Claims—Reimbursement Prohibition*, 41 Comp. Gen. 235, 237 (1961); *Public Property—Loans Between Departments—Repairs and Replacements*, 10 Comp. Gen. 288, 289 (1930) ("*Public Property*"). Absent a contrary statute, the agency with custody of the property may not even charge rent to the agency using the property. *See National Weather Service*, 71 Comp. Gen. at 2 (citing prior Comptroller General decisions); *Leases—Rent—Property Held by the Reconstruction Finance Corporation*, 20 Comp. Gen. 699, 701 (1941) ("[T]he general rule is that

payment of rent is unauthorized by one Government department or agency for premises under the administrative control of another department or agency."). Some Comptroller General opinions have also reasoned that the agency with ultimate custody of the property should pay for repairs because those repairs are for its "future use and benefit." *Public Property*, 10 Comp. Gen. at 289; *see also, e.g.*, *Use of One Agency's Real Property by Another—Liability for Damage*, 59 Comp. Gen. 93, 95 (1979) ("*Use of One Agency's Real Property*").

The doctrine predates the creation of the office of Comptroller General and was first articulated by the Executive Branch in 1899, when the Comptroller of the Treasury concluded that, after a vessel of the U.S. Navy was damaged by a ship of the Revenue-Cutter Service, the costs of repairs had to be paid from the Navy's appropriations, reasoning that "the injured vessel is a vessel of the Navy" and "the appropriation for expenses of the Revenue-Cutter Service, which is applicable to repairs of revenue vessels only, is not applicable to repairs of vessels of the Navy." *Damage to a Vessel of the Navy by Collision with a Revenue-Cutter Vessel*, 6 Comp. Dec. 74, 74–75 (1899) ("*Damage to a Vessel*"); *see Attorney General—Opinions—Comptroller of the Treasury*, 26 Op. Att'y Gen. 609, 610 (1908) (explaining that the Comptroller of the Treasury's opinions were, by statute, generally binding within the Executive Branch). By 1945, the Comptroller General could state that it had "been held repeatedly that [a department's or agency's] funds are not available for payment of claims for damages to the property of other Government departments or agencies." *Government Corporation Vessels Damaged by Naval Vessels—Appropriation Availability for Payment of Damage Claims*, 25 Comp. Gen. 49, 54 (1945). And in 1952, the Comptroller General characterized the doctrine as "so firmly embedded in the substantive law of the United States as to require specific statutory authority to overcome the rule." *National Forest Lands—Interagency Use—Liability for Damages, Restoration, Etc.*, 32 Comp. Gen. 179, 180 (1952) ("*National Forest Lands*").[2]

---

[2] As we have said before, "the opinions of the Comptroller General do not bind the Executive Branch, but they may provide helpful guidance on appropriations matters and related questions." *Applicability of the Miscellaneous Receipts Act to an Arbitral Award of Legal Costs*, 42 Op. O.L.C. __, at *3 n.2 (Mar. 6, 2018). That is especially so when, as

Because the interdepartmental-waiver doctrine reflects a background principle of appropriations law, Congress may override it and has done so in a number of instances. Most significantly, in the Economy Act of 1932, Congress authorized an agency to "place an order with . . . another agency for goods or services" and thereby impose conditions on the loan or use of property. 31 U.S.C. § 1535. Shortly before the Economy Act, the Comptroller General had concluded that one agency could not pay to restore another agency's property even when such restoration was provided for in an agreement between the agencies. *See, e.g.*, *Public Property*, 10 Comp. Gen. at 288 (holding that the interdepartmental-waiver doctrine applied even though the loan at issue was made "with the understanding that the articles were to be returned in good condition" and that the loaning agency "would be reimbursed for the cost of [restoring] the property"). Now, however, the Economy Act "'provide[s] the specific legislative authority stated by the Comptroller General to be necessary by authorizing the performance of work or services or furnishing of materials by one department or establishment to another without any limitation.'" *Jack Brooks, House of Representatives*, B-197686, 1980 WL 14507, at *2 (Comp. Gen. Dec. 18, 1980) (quoting *Interdepartmental Work: Hearings on H.R. 10199 Before the H. Comm. on Expenditures in the Executive Departments*, 71st Cong. 4 (Apr. 10, 1930)); *see* 3 *Federal Appropriations Law* at 12-22 (3d ed. 2008) (similar). If agencies satisfy the Economy Act's criteria for interagency agreements, then they may contract around the doctrine.[3]

---

explained below, Congress has effectively ratified the Comptroller General's long-established default rule by specifically overriding it in some, but not all, instances.

[3] *See, e.g.*, *Department of the Air Force—Reimbursement of Industrial Fund Agency for Damage to Vehicle*, 65 Comp. Gen. 910, 911 (1986) (noting that a "major exception [to the interdepartmental-waiver doctrine] is where reimbursement for damages has been provided for in an agreement under the Economy Act"); *Finance and Accounting Officer, Department of the Army*, B-146588, 1961 WL 2188, at *1 (Comp. Gen. Aug. 23, 1961) (concluding that the Army and the Air Force had entered into a valid Economy Act agreement under which the Army could reimburse the Air Force for damage to borrowed planes); *Public Property—Loans Between Departments, Etc.—Liability for Repairs*, 30 Comp. Gen. 295, 296–97 (1951) (finding that the Economy Act modified the result in the 1930 *Public Property* opinion, such that the Bureau of Land Management could execute an agreement requiring that its boat be returned in a condition as good as when it was loaned).

In addition to the Economy Act, Congress has enacted other targeted exceptions to the doctrine's default rule. For example, when an agency has received "an appropriation specifically for the purpose of removing improvements on land withdrawn for its use," that is understood as supplying "the statutory authority . . . required" to displace the interdepartmental-waiver doctrine. *Interdepartmental Waiver Doctrine—Withdrawn Lands*, 60 Comp. Gen. 406, 407–08 (1981) ("*Withdrawn Lands*"). Thus, in 1984, Congress specifically authorized the military departments to "remove improvements and take any other action necessary . . . to restore land used" under a "permit from another military department or Federal agency," when the permit requires restoration. 10 U.S.C. § 2691(a). And, in 2017, Congress amended that section to allow the Secretary of Defense to "restore" land under the administration of a different federal agency when the land is "damaged as a result of a mishap involving a vessel, aircraft, or vehicle of the Department of Defense." *Id.* § 2691(e)(1) (Supp. V 2017). As the conference report explained, the amendment as it was enacted supplied the same authority that the Senate bill had expressly entitled an "[e]xception to the interdepartmental waiver doctrine for cleanup of vehicle crashes." H.R. Rep. No. 115-404, at 944 (2017) (Conf. Rep.). Congress has also given the General Services Administration ("GSA") the authority to recover from other agencies the costs of operating and maintaining a motor pool, including "estimated replacement cost." 40 U.S.C. § 605(b)(2). Thus, when a vehicle in GSA's motor pool is damaged as a result of a driver's "misconduct or improper operation," GSA is permitted to "charg[e] such losses directly to the agency whose driver is responsible for the loss." *Interagency Property Damage Liability*, 59 Comp. Gen. 515, 517 (1980).[4]

---

[4] The Comptroller General has also recognized an exception to the interdepartmental-waiver doctrine where an agency's activities are supported by a revolving fund, a mechanism that authorizes an agency to retain receipts and deposit them into the fund to finance the fund's operations. *See National Weather Service*, 71 Comp. Gen. at 3 ("[W]e have recognized exceptions to the interdepartmental waiver doctrine where Congress has, by statute, expressly required an interagency activity to operate on a self-sustaining basis by recovering all costs from using agencies."); *Loan of Equipment Purchased from the Reclamation Fund*, 3 Comp. Gen. 74, 74–75 (1923) (explaining that the interdepartmental-waiver "rule is predicated on appropriations not reimbursable," so another agency's "use of equipment purchased [by an agency with a reimbursable fund] is on a some-

The Executive Branch has similarly applied the interdepartmental-waiver doctrine since at least the Comptroller of the Treasury's 1899 decision in *Damage to a Vessel*. *See* 6 Comp. Dec. at 74–75; *see also Replacing Property Borrowed from Another Department*, 10 Comp. Dec. 222, 224–25 (1903); *Ownership of Public Property*, 22 Comp. Dec. 390, 390 (1916). Executive agencies have considered and applied the doctrine when promulgating regulations, guidance, and legal opinions. *See* 32 C.F.R. § 536.27(g) (subsection of Department of the Army regulations about claims against the United States, stating that "[n]either the U.S. government nor any of its instrumentalities are proper claimants due to the interdepartmental waiver rule"); U.S. Dep't of Energy, DOE 4300.1C, *Real Property Management* (June 28, 1992) (agency guidance noting that "[t]he Interdepartmental Waiver Doctrine should be considered whenever there is a possibility of outgranting property to other Federal agencies"); Office of General Counsel, Immigration & Naturalization Service, U.S. Dep't of Justice, *Missing GSA Painting*, Op. No. 93-29 (May 5, 1993) (describing the doctrine as "the substantive law of the United States"). The interdepartmental-waiver doctrine thus establishes the general default rule for allocating the costs of repairs among departments and agencies.

## B.

Applying the foregoing principles, we conclude that the interdepartmental-waiver doctrine prohibits Labor from paying for the removal of the Treasure Lake structures. Interior has custody over the Wichita Mountains Wildlife Refuge, where the Treasure Lake structures are located. The Comptroller General has previously (and, in our view, correctly) concluded that other conservation sites are subject to the interdepartmental-waiver doctrine, as is governmental property generally. *See Public Lands—Interagency Loans, Transfers, Etc.—Damages, Restoration, Etc.—Authority*, 44 Comp. Gen. 693, 695 (1965) ("*Public Lands*") (opining that the Army may not reimburse the National Park Service for road repairs after military exercises because "an executive department may not be reimbursed for the use or depreciation of real property loaned, used or damaged by another department"); *National Forest Lands*, 32

---

what different basis, the equipment being an asset which should not be permitted to be depreciated from use on other than objects for which the fund was created").

Comp. Gen. at 180 (rejecting the argument that the interdepartmental-waiver doctrine "should not apply to national forest lands since such lands are analogous to property held in trust"). This result comports with the notion that the interdepartmental-waiver doctrine allocates losses to the agency that will benefit from the future use of the repaired property. Because Labor is no longer using the Treasure Lake property, Labor will receive no future benefit from removing the structures. To the contrary, the benefits from restoration will flow to Interior, which seeks the structures' removal to advance its statutory mission of managing a wildlife refuge. *See Withdrawn Lands*, 60 Comp. Gen. at 408 (noting that a restoration benefits the lending agency when the agency "would use the property upon its return to carry out agency functions"). Absent a contrary statute, the interdepartmental-waiver doctrine applies and makes Interior responsible for the costs of restoration.

We do not believe that any statute displaces the general rule here. Labor's Job Corps appropriations have not expressly provided for the removal of structures at Treasure Lake. Nor have they otherwise authorized Labor, more generally, to pay damages for its use of other agencies' lands. *See, e.g.*, Labor FY 2019 Appropriations, 2018 U.S.C.C.A.N. (132 Stat.) at 3050; *see also Withdrawn Lands*, 60 Comp. Gen. at 407–408 (noting that when an agency has an "appropriation specifically for the purpose of removing improvements on land withdrawn for its use, this constitutes the statutory authority . . . required" to overcome the interdepartmental-waiver doctrine); *Public Lands*, 44 Comp. Gen. at 693, 695 (concluding that the Army could not reimburse Interior for property damage, even though Army appropriations contained no limitations on such expenditures). And Interior has no authorization to charge other agencies for costs arising from their use of wildlife refuges. *See* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. E, tit. I (making appropriations for Interior, including the Fish and Wildlife Service, but containing no such authority); Consolidated Appropriations Act, 2017, 131 Stat. at 436–68 (same); *see also National Forest Lands*, 32 Comp. Gen. at 180–81 (concluding that the Secretary of Agriculture's statutory authority to protect and preserve national forests does not override the interdepartmental-waiver doctrine).[5]

---

[5] We thus reject the premise of Labor's alternative argument that Interior's purportedly-more-specific appropriation governs over what Labor describes as more-general

Furthermore, no other exception to the interdepartmental-waiver doctrine applies. Labor and Interior did not enter into any agreement under the Economy Act or similar statutory authority under which Labor "assume[d] responsibility for the removal of the structures or the restoration of the wildlife refuge following the closure of the Center." Labor Reply Letter at 2.[6] And Interior's relevant appropriations are annual appropriations, not revolving funds. *See supra* note 4.

## C.

In reaching this conclusion, we have considered other points that Interior contends would, when taken in combination, support having Labor pay to restore the Treasure Lake property.

First, Interior argues that the interdepartmental-waiver doctrine should be limited to situations where an agency unforeseeably or accidentally damages another agency's property. In its view, where an agency's activities foreseeably damage another agency's property, the costs of restoration are sufficiently predictable that they should be borne by the agency responsible for the damage. *See* Interior Letter at 12–15. As Interior acknowledges, however, several Comptroller General opinions go the other way, *see id*. at 11, and we believe that those decisions correctly interpret the doctrine.

The Comptroller General's long-standing view is that the interdepartmental-waiver doctrine does not turn upon the cause of, or comparative fault for, the property damage. *See, e.g.*, *National Forest Lands*, 32 Comp. Gen. at 180–81 ("The question is not how the damages were caused, but

---

language in its Job Corps appropriation. *See* Labor Letter at 1–3. The dispositive question is not which agency's appropriation contains more specific language, but whether Congress has overridden the interdepartmental-waiver doctrine. Even if Interior's appropriation contained more-general language than Labor's appropriation, it would be irrelevant unless Labor's appropriation (or some other statute) specified with sufficient clarity that, notwithstanding the interdepartmental-waiver doctrine, Labor could bear the costs of removing the Treasure Lake structures.

[6] This opinion does not address whether an agreement concerning real property constitutes an agreement "for goods or services" under the Economy Act, 31 U.S.C. § 1535(a), or whether an agreement concerning services related to real property—such as the removal or alteration of facilities like those at Treasure Lake—could have been reached under the Economy Act or similar statutory authority.

to which agency has the Congress delegated the responsibility for administering and conserving the property and to which agency has it appropriated funds for such repair and replacements as may be necessary."); *Public Property*, 10 Comp. Gen. at 289 (noting that the doctrine bars interagency reimbursement not only for property loss or damage, but also for property "use or depreciation"). That is also the Executive Branch's long-standing view. *See Damage to a Vessel*, 6 Comp. Dec. at 75 ("The appropriation [of the custodial agency] . . . is applicable . . . without regard to the origin of the injury necessitating the repairs, whether arising from natural deterioration or wear and tear, or from an accident of any kind, whether by the fault of the officers of the [custodial agency] or others or otherwise."). That view is consistent with the doctrine's underlying premise: Regardless of whether one agency has damaged another agency's property in a foreseeable or unforeseeable manner, the agency with custody of the property does not make a claim for damage because the property belongs to the government as a whole. Even if we were to distinguish between the individual agencies' interests in this context, the same conclusion would follow, because the agency with custody of the property will be the one that reaps the benefits of removing the structures at Treasure Lake. *See Public Property*, 10 Comp. Gen. at 289.

Second, Interior contends that the interdepartmental-waiver doctrine has generally been applied to personal property, and not to real property like the buildings and other permanent improvements at Treasure Lake. *See* Interior Letter at 9, 11, 15. Interior reads the Comptroller General's 1981 opinion in *Withdrawn Lands* as "appear[ing] to narrow" the doctrine's applicability in cases involving public lands. *Id*. at 11–12. We disagree with Interior's attempt to extend that opinion's reasoning to Treasure Lake. In *Withdrawn Lands*, the Comptroller General concluded that the interdepartmental-waiver doctrine should not apply to public lands managed by the Bureau of Land Management because those lands were held in anticipation of future assignment. *See* 60 Comp. Gen. at 408–09. The opinion explained that the Bureau "does not benefit, in the sense referred to in the [Comptroller General's previous decisions], from restoration by another agency" of its lands. *Id*. at 408. Significantly, the Comptroller General contrasted the Bureau's public lands with National Forest lands administered by the Forest Service, reasoning that "restoration of property within the Forest's boundaries" would "clearly benefit[]

the Forest Service," rather than the paying agency. *Id*. at 409. That same distinction would also apply to repairs within wildlife refuges, which are administered by Interior in a similar fashion, for long-term preservation and public benefit. *Compare, e.g.*, 16 U.S.C. § 742a (giving the Fish and Wildlife Service the statutory goal of "maintaining and increasing the public opportunities for recreational use of our fish and wildlife resources"), *with id*. § 1609(a) (giving the National Forest System and Forest Service the statutory mission of maintaining a system of forests "dedicated to the long-term benefit for present and future generations").

Furthermore, as Interior acknowledges, *see* Interior Letter at 11 & n.40, a number of other Comptroller General opinions, before and after 1981, have applied the interdepartmental-waiver doctrine to real property. *See, e.g.*, *National Weather Service*, 71 Comp. Gen. at 2 (reaffirming that the "interdepartmental waiver doctrine prohibits a federal agency from paying for the use or repair of real property controlled by another federal agency"); *Use of One Agency's Real Property*, 59 Comp. Gen. at 93–95 (applying doctrine to Army's damage to national forest lands); *Public Lands*, 44 Comp. Gen. at 695 (applying doctrine to Army's damage to lands in national recreation area); *National Forest Lands*, 32 Comp. Gen. at 179–81 (applying doctrine to Army's damage to national forest lands).

Finally, we disagree with Interior's contention that the necessary-expense doctrine would authorize Labor to pay for removing the Treasure Lake structures. *See* Interior Letter at 9. This Office has explained that the Comptroller General's necessary-expense doctrine tracks our interpretation of the Purpose Act, 31 U.S.C. § 1301(a). *See State and Local Deputation of Federal Law Enforcement Officers During Stafford Act Deployments*, 36 Op. O.L.C. 77, 87–88 (2012). The basic principle is that a federal agency may use its appropriations for purposes that Congress has not expressly specified, so long as the "expenditure bears a logical relationship to the objectives of the general appropriation[] and will make a direct contribution to the agency's mission." *Id*. (internal quotation marks omitted). But treating each agency as having an implicit authorization to use its funds to pay other agencies would render the interdepartmental-waiver doctrine superfluous. If agencies were already authorized to pay for the repair or restoration of other agencies' property whenever doing so bore some relation to the objects of a general appropriation, then there would never be a need to determine whether a specific appropriation

authorized an agency using another agency's property to bear the costs of that use. Nor would there be any need for the Economy Act; agencies would already be entitled to make such agreements whenever they are "reasonably necessary" to achieve the goals of an appropriation. We therefore think that a more-specific authorization is required to override the interdepartmental-waiver doctrine's default rule.

### III.

Interior is the custodian of the land at Treasure Lake. Accordingly, we conclude that, under the interdepartmental-waiver doctrine, Labor cannot pay to remove the structures at Treasure Lake, and, further, that no statutory authority has displaced that doctrine's applicability in this instance.

CURTIS E. GANNON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*